van Gestel, Allan, J.
All counts of the Second Amended Complaint,[3] all counterclaims and all third-party claims between and among the various parties now have been resolved by settlement, summary judgment or other dispositive motion, waiver or trial by jury, except for Count VII (unjust enrichment), Count VIII (declaratory judgment), Count IX (breach of fiduciary duty), and CountXII (violation of G.L.c. 93A, sec. 9) running against the defendant Robert E. Sayre (“Sayre”). What follows here are the Court’s findings of fact, rulings of law and an order for judgment on the remaining counts.

FINDINGS OF FACT

Sayre is a psychologist, first licensed in Massachusetts in 1973, who, at various times, treated Hilda Ayer Anderson (“Mrs. Anderson”). Also, at various times, Sayre was employed by the Ayer-Anderson Foundation, Inc. (the “Foundation”).
Mrs. Anderson is a wealthy woman. She is nearly— indeed, by now may be — 80 years old.
Sayre first met Mrs. Anderson in 1985. She was referred to him by Dr. George Arroll, who was then one of Mrs. Anderson’s psychiatrists. At that time, Sayre began treating Mrs. Anderson and her then husband, Harry Curtis, principally through marriage counseling.
From Mrs. Anderson’s psychiatrists, Dr. Arroll and a Dr. Jeffrey M. Hoffman, Sayre learned that she was thought to have a personality disorder, an anxiety disorder and problems with alcohol. The personality disorder was defined by Sayre as “a person with a very fragile self-concept; a person who may have severe mood swings; a person who values and devalues relationships to an extreme; a person who, under extreme stress, has difficulties basically holding themselves together.” Sayre reported that Mrs. Anderson “had great problems with . . . mood issues. She had difficulty tolerating stress. She had intense emotional responses to things. Her self-concept was very poor. Those are the primaiy issues that she exhibited.”
Sayre learned from Dr. Arroll that Mrs. Anderson had had several psychiatric hospitalizations in the past. Most of those hospitalizations had been brought on by complications from abuse of alcohol and its effect on her mental state. Mrs. Anderson told Sayre that she had had electric shock therapy.
Sayre also reported that Mrs. Anderson had an anxiety disorder, meaning: “An individual who has a general sense of foreboding; basically, is having a fear response without an object or event that would normally cause that fear; basically, it’s a flight-type of feeling; and it generalizes to daily events.” “She would become intensely anxious. She would get angry. She would want . . . people close by her.” This made her “more demanding of others.”
From some time in 1986 through 1991, Sayre primarily treated Mrs. Anderson for alcoholism. “She was drinking intensely at periods. It was a progressive problem. It made her more intense. It made her more violent.” When she was intoxicated, she “had difficulties with normal cognitive processes.”
*224 During the period from 1986 to 1991, Sayre also diagnosed Mrs. Anderson with depression. He called it “major depression, recurrent.” She “was having hopelessness, helplessness. She was — became intensely irritable. She was having difficulties getting along with her husband.”
In addition to the foregoing, Sayre determined that Mrs. Anderson had an eating disorder called anorexia.
Prior to a 1989 admission to Baldpate Hospital for her alcohol problem, Sayre was in contact with her almost every day. When she was released from Bald-pate on October 26, 1989, she did not require as much attention from Sayre. Eventually, in 1991, at Mrs. Anderson’s request, Sayre stopped seeing her.
In 1994 Sayre once again began treating Mrs. Anderson. His treatment of her increased progressively. During this period she “had alcohol dependence in remission. She had continuing anxiety. She had continued depression, and she had continued eating problems. She had continued exacerbated problems in her marriage, and she continued to have difficulties in terms of her relationships with her family.” Sayre’s previous diagnoses did not change, and he did not reach any new diagnoses. Also, during this time Mrs. Anderson divorced Harry Curtis.
Because of Mrs. Anderson’s demands on his time, and at the urging of Mrs. Anderson and her attorney, Jon F. Conant (“Conant”), Sayre stopped working at Salem Hospital and accepted a position as “on-site supervisor” at the Foundation. This enabled him to be available to her at all times. The Foundation was within a short walking distance from Mrs. Anderson’s home near Wingaersheek Beach in Gloucester. His position at the Foundation was to supervise the staff, to greet people, to socialize with Mrs. Anderson when she came by, to try to establish programs and basically to do her bidding in terms of establishing the Foundation the way that she wanted it to be run.
The Foundation was a veiy important, perhaps critical, factor in Mrs. Anderson’s life generally, and her sobriety and mental stability particularly.
Sayre continued as Mrs. Anderson’s psychologist from 1994 until he was terminated by her in early 2003. Sayre agreed to charge Mrs. Anderson an hourly rate of $150 for his personal treatments to her. During this period he also was paid $750 per week by the Foundation, from which he also received other benefits.
The nature of Sayre’s treatments of Mrs. Anderson after he resumed them in 1994 was different from that in the period before her Baldpate Hospital admission in 1989. By 1994 she had been successful in keeping her alcohol problem under control. Thus, as she began to involve herself more intensely with the Foundation, much of Sayre’s work became more focused on assisting her with interpersonal relationships with her staff and employees and with her own self-esteem. He described it more like coaching than psychotherapy. However it was characterized, Sayre was acting in a psychologist/patient relationship with Mrs. Anderson, and he agreed with her to do so at a rate of $150 per hour.
During the entire time that Sayre treated Mrs. Anderson, both before and after the Baldpate Hospital admission, she was represented by attorney Jon Conant. In fact, in addition to acting as Mrs. Anderson’s attorney, Conant had a broadly worded durable power of attorney from her enabling him to freely handle her money.
Although not a causative factor in the claims against Sayre, Mrs. Anderson’s relationship and situation with Conant warrants comment.
In the principal portion of this case, Conant was charged by Mrs. Anderson with a number of acts of legal malpractice and breaches of fiduciary duly in connection with his mishandling and mismanagement of her funds. Conant himself admitted his failure to properly account for Mrs. Anderson’s funds. He maintained no ledger or other accounting of the transactions involving her funds commingled with others in his IOLTA account, or of the checks he wrote to himself. Further, he maintained no effective billing records. In his Amended Answer to Interrogatoiy No. 1, Conant stated, among other things: “He did not maintain detailed descriptions recording the nature of services rendered, nor did he create invoices for the services rendered after the first year or two because compensation was generally reviewed on an annual basis.” When asked for an accounting in this proceeding, Conant simply handed the plaintiffs a mass of documents and suggested they should do it themselves.
On a motion for summary judgment against him on Count I, this Court ruled that
Conant has not in any way met his burden of proof that he properly disposed of [Mrs. Anderson’s] funds which he is shown to have received in his fiduciary capacity as her attorney. Consequently, summary judgment in the plaintiffs’ favor, at least on the issue of liability, is warranted on Count I of the First Amended Complaint. While much seems obvious, the Court cannot, on the present record, determine the correct amount of the funds mishandled. Therefore, damages on Count I must remain open at this time.[4]
It was at Mrs. Anderson’s express direction that Sayre, at all times, sent his bills to Conant. All such bills were, albeit sometimes not on a timely basis, paid by Conant without any apparent question as to their correctness. The money, of course, came from a revocable trust for the benefit of Mrs. Anderson. She herself never saw — nor, does it appear, ever asked about — Sayre’s bills.
*225 This Court finds that whatever the precise nature of Sayre’s treatment of Mrs. Anderson after her return from Baldpate Hospital, it appears to have been beneficial to her in significant ways. On the claims presented to the jury on the negligence aspects of malpractice on Sayre’s part — the principal claim being that his acceptance of employment at Mrs. Anderson’s Foundation was an inappropriate “boundary” violation — this Court agrees with the jury that Sayre caused no physical or mental harm to his patient.
Similarly, the Court finds, as did the jury, that Sayre’s handling of the contractual side of his professional relationship with Mrs. Anderson was less than appropriate. This relates primarily to his billing practices.
For the period from 1994 through March 31, 2003, Sayre received an aggregate amount of $448,049 from the Foundation. During that same period he received $623,175.30, through Conant, as fees for services supposedly rendered to Mrs. Anderson. The breakdown on the fees for services for the years from 1994 through March 31, 2003, except for the year 1995 for which no evidence was presented, was as follows: 1994, $10,200; 1996, $22,685.88; 1997, $60,616.36; 1998, $83,850; 1999, $95,441; 2000, $97,000; 2001, $122,276.25; 2002, $104,548.81; and 2003, $26,557.
Almost all of Sayre’s invoices to Mrs. Anderson for psychological services starting in 1994, sent to and paid by Conant, contained no explanation whatsoever as to what treatment was being provided. The invoices simply listed dates, names, and numbers of hours for each date. While this would make it difficult enough to determine what was proper if the invoices simply listed a date, “Hilda”[5] and a number of hours, the invoices were more complicated, albeit no more informative, than that.
On numerous invoices that included separate entries for “Hilda,” there were also entries designated “Hilda, Paul and Frank.” These latter entries were always on either a Tuesday or a Thursday, and were almost always for “4 hours.” “Paul” was Mrs. Anderson’s husband; and “Frank” was an astronomer. Frank came to the Foundation twice a week, on Tuesday and Thursday evenings, and ran courses in astronomy with a telescope.
There was no evidence that Frank was ever treated by Sayre for any ailment, psychological or otherwise. And if Paul was receiving any treatment from Sayre at the times of the astronomy sessions, such treatment was in no way described on the invoices or at trial.
There were at least 576 of these 4-hour, "Hilda, Paul and Frank” entries in Sayre’s invoices. All of those invoices were paid without question by Conant, using money sent to him on his requests from the managers of Mrs. Anderson’s trust fund. At $150 per hour, these 576 “Hilda, Paul and Frank” charges aggregated at least $345,600 for psychological services that were not in fact part of any treatment that Mrs. Anderson received. This was a clear breach of Sayre’s psychologist/ patient contractual relationship with Mrs. Anderson.
On the evidence presented, the Court is unable to quantify any other breaches of the psychologist/patient contract resulting from payments of which Mrs. Anderson was not aware or on payments that she did not approve.

RULINGS OF LAW

The Court first focuses briefly on the four remaining counts.
Count VII, described as being for unjust enrichment, after asserting that the “defendants were not entitled to the payments taken from plaintiffs,” closes with the allegation that “plaintiffs are entitled to restitution of all sums by which defendants have been unjustly enriched.”[6] Although described as a count, “unjust enrichment” is actually the basis for an equitable remedy for breach of a fiduciary duly. See, e.g., Cann v. Barry, 293 Mass. 313, 316-17 (1936). A constructive trust is the usual relief to prevent unjust enrichment. See, e.g., Barry v. Covich, 332 Mass. 338, 342-43 (1955). Similarly, “restitution” is a form of damages awarded when a defendant has been unjustly enriched at the plaintiffs expense.
Count IX alleges that Sayre owed fiduciary duties to Mrs. Anderson and that, among other things, he breached those duties by billing for therapy sessions that did not occur. Claims for breaches of fiduciary duties are generally equitable in nature. Demoulas v. Demoulas, 428 Mass. 555, 580-81 (1998). “A court has the power to grant equitable relief when there has been a violation of fiduciary duty... to avoid unjust enrichment of the fiduciary at the expense of the beneficiary. ” Id. The relief for such breaches can include restitution, Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 556 (1997), or disgorgement of any personal gain. Berish v. Bornstein, 427 Mass. 252, 271 (2002).
To the extent that Count VII is a count at all, it is subsumed by Count IX.
Count VIII asserts that there is “an actual controversy between plaintiffs and Sayre as to Sayre’s entitlement to the past, present and future payments made to him.” It then proceeds to pray for a declaratory judgment establishing Mrs. Anderson’s rights to Sayre’s disgorgement of all such payments.
Count XII is brought pursuant to G.L.c. 93A, sec. 9. It charges Sayre with unfair and deceptive practices in connection with Mrs. Anderson while being engaged in trade or commerce. The essence of the charges are: breaching fiduciary duties; and billing for therapy sessions that never occurred.
There are elements in common in all remaining counts. Consequently, except where necessary for legal reasons, all four counts will be dealt with together in these rulings.
*226 There is no real challenge by Sayre that his relationship with Mrs. Anderson from 1994 until terminated in 2003 met the requirements of a psychologist/patient relationship. See, e.g., Lambley v. Kameny, 43 Mass.App.Ct. 277, 283-85 (1997).
A malpractice claim, like that against Sayre, is not either purely contractual or purely tortious in nature. It can include claims that constitute both a breach of contract and negligence. See, e.g., New Hampshire Insurance Company, Inc. v. McCann, 429 Mass. 202, 209 (1999). What is addressed in these rulings is more on the contract side than the negligence side. The latter was covered in Count X that was tried to the jury.
The relationship between a psychologist and his patient is generally described in Principle B: Fideliiy and Responsibility, of the Ethical Principles of Psychologists and Code of Conduct (June 1, 2003), incorporated in 251 CMR sec. 1.10(1). Principle B, in its first sentence, reads: “Psychologists establish relationships of trust with those with whom they work.”
Both the June 1, 2003 edition and the earlier December 1, 1992 edition of the Ethical Principles of Psychologists and Code of Conduct speak to fees. The earlier version states in Sec. 1.25(b) that “Psychologists do not exploit recipients of services . . . with respect to fees” and in Sec. 1.25(d) that “Psychologists do not misrepresent their fees.” The later version states in Sec. 6.04(c) that “Psychologists do not misrepresent their fees.”
As found above, Sayre contracted with Mrs. Anderson to provide her psychological services at a rate of $150 per hour. This Court rules that he breached that contract on at least 576 occasions when he billed for services for “Hilda, Paul and Frank.” The aggregate amount of those billings was $345,600.
Without explaining those billings in any convincing way, Sayre argues, however, that Mrs. Anderson — despite her psychological maladies — was not proven to have been incompetent to understand the services she demanded of him or the hourly amount he was charging therefor. He further argues that, as directed, he sent all of his billings to Mrs. Anderson’s attorney, and all bills were paid without question.
Given Sayre’s fiduciary duties to his patient not to exploit her with respect to fees and not to misrepresent his fees, it is not enough to say that neither Mrs. Anderson nor her attorney questioned Sayre’s billings. Mrs. Anderson never saw the bills; and Jon Conant, her attorney, was not a participant at the time of the rendering of psychological services. Each of Mrs. Anderson and Conant had a right to assume that Sayre was abiding by his fiduciary duties with regard to his billing practices.
There is ample evidence to warrant finding for Mrs. Anderson on Counts VII, VIII and IX. Count XII, however, requires further analysis.
G.L.c. 93A, sec. 9 creates a private right of action to the “consumer . . . ‘who participates in a commercial transaction on a private, nonprofessional basis.’ ” Shawmut Community Bank, N.A. v. Zagami, 411 Mass. 807, 814 (1992). Section 9 was amended in 1979, after the occurrences in Zagami, to permit a claim to be brought by “(a]ny person, other than a person entitled to bring action under section eleven.” Mrs. Anderson is such a person. She also is a person who engaged in the relationship with Sayre “for merely personal reasons” and, therefore, may bring a claim under G.L.c. 93A, sec. 9. Frullo v. Landenberger, 61 Mass.App.Ct. 814, 821 (2004).
A claimant under Section 9(3) must send a demand letter at least 30 days prior to the filing of such action “reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered.” Mrs. Anderson sent two demand letters: the first on January 27, 2004; and the second on January 27, 2005. The original complaint was filed on April 28, 2003; a first amended complaint was filed on May 20, 2004; and a second amended complaint was filed on April 14, 2005. Mrs. Anderson’s demand letters were too late for the original complaint; the first demand letter was timely for the first amended complaint; and the second demand letter was too late for the first amended complaint and timely for the second amended complaint.
Because the case went to trial on the second amended complaint, the Court will only assay the second demand letter for compliance with the Section 9(3) requirements in addition to timing. The letter must describe the unfair or deceptive act or practice relied on and the injury suffered by Mrs. Anderson. Relief based on conduct not specifically mentioned in the demand letter is foreclosed as a matter of law. Clegg v. Butler, 424 Mass. 413, 423 (1997); Bressel v. Jolicoeur, 34 Mass.App.Ct. 205, 211 (1993).
In two sections of the January 27, 2005 demand letter, Mrs. Anderson sets forth the conduct which she deems to be unfair or deceptive. Her letter states, among other things, the following:
I am writing to you[7] pursuant to M.G.L. ch. 93A, sec. 9 concerning your client’s, Dr. Robert E. Sayre (“Sayre”), unfair and deceptive practices in connection with his former client, Mrs. Anderson, including, without limitation, billing Mrs. Anderson for: (1) four-hour alleged “therapy sessions” that Sayre initiated — not Mrs. Anderson; (2) fictitious “therapy session” with her husband Paul Anderson and with an astronomer hired by Sayre and Jon Conant (“Conant”) — which never occurred . . . Sayre over-billed Mrs. Anderson because he knew that due to her illness she was incapable of understanding how much he was actually charging her. In short, Sayre exploited his patient’s frailties for his own personal gain . . .
*227 sf; sf: $ sfc
As her psychologist, Sayre owed Mrs. Anderson the highest fiduciary duty. He breached that duty (and the cannons [sic] of professional ethics) by exploiting her frailties for his own gain. Sayre’s conduct violated M.G.L. ch. 93A, and has caused significant damages to Mrs. Anderson.
Mrs. Anderson demands that Sayre: (1) refund the amounts that he over-billed her for his “services”
This Court finds the demand letter satisfactory in its explication of the claims presented.
Next, the Court must determine whether the relationship between Mrs. Anderson and Sayre was one to which G.L.c. 93A, sec. 9 applies. It would seem that this assessment turns on what in fact happened in the psychologist/patient relationship that existed between Mrs. Anderson and Sayre between 1994 and 2003.
On the evidence presented, with one exception, there is no proof of any harm to Mrs. Anderson from anything that Sayre did in his professional ministrations. Indeed, if anything, Mrs. Anderson seemed clearly to benefit from his “treatment.” There being no showing of harm, there is no basis for ruling that a c. 93A violation was proved. See, e.g., Freedman v. Sock, 49 Mass.App.Ct. 1117 (2000), a Memorandum and Order Pursuant to Rule 1:28. See also Kantrovitz v. The Academy of Physical and Social Development Corporation, 370 Mass. 858 (1976).
The one exception mentioned above relates to that aspect of the psychologist/patient relationship that involves misrepresentation or exploitation with regard to fees for services. It is here that Mrs. Anderson suffered monetary damages. As stated above, the Ethical Principles of Psychologists and Code of Conduct (June 1, 2003) is incorporated in 251 CMR sec. 1.10(1). This incorporation includes the provisions regarding misrepresentation and exploitation regarding fees. Inhabiting, as they do, a place in the Code of Massachusetts Regulations, these ethical principles are a part of the law of Massachusetts.
While this Court has neither been cited to, nor found itself, any case involving whether the fee practices of a psychologist are subject to c. 93A, sec. 9, there is law relating to lawyers that suggests an answer. In Brown v. Gerstein, 17 Mass.App.Ct. 558 (1984), Justice Greaney said at p. 570:
In deciding whether Gerstein’s alleged wrongdoings occurred within the conduct of trade or commerce as required by sec. 2(a) of c. 93A, we find the decision of Guenard v. Burke, 387 Mass. 802, 808-11 (1982), controlling. Guenard held that a claim against an attorney by his client for damages in connection with the attorney’s execution of an unlawful contingent fee agreement could be maintained under G.L.c. 93A, secs. 2(a) and 9. The decision further held (at 809) that the attorney’s reliance on the illegal agreement for his fee constituted, as a matter of law, an unfair or deceptive act prohibited by c. 93A, sec. 2(a), and that the violation entitled the plaintiff to press her claims for multiple damages, attorneys fees, and costs.
This Court sees little substantive difference between an attorney pursuing an illegal fee agreement against a client and a psychologist misrepresenting the amount of his fees or exploiting his position with his patient regarding his fees, which is made illegal by the incorporation of the Ethical Principles of Psychologists and Code of Conduct (June 1, 2003), into 251 CMR sec. 1.10(1).
There have been arguments by Sayre that the four-year statute of limitations for c. 93A claims applies to at least some of the monetary losses sustained. The complaint was first filed on April 28, 2003. Consequently, it is argued, any fee payments made earlier than April 28, 1999 cannot be the subject of relief in this case. However, the discovery rule “applies to actions based on G.L.c. 93A.” Syzmanski v. Boston Mutual Life Insurance Company, 56 Mass.App.Ct. 367, 370 (2002).
When, therefore, did Mrs. Anderson know enough about Sayre’s billing practices to make her cause of action accrue? She did not receive the bills and she did not pay them; that was Conant’s job, and Sayre knew it. But Conant, as noted above in the findings of fact, failed utterly in the task. Who then, as between Sayre and Mrs. Anderson ought to gain or lose as a result of Conant’s fiduciary breaches? In a battle between a psychologist with significant fiduciary duties to his patient, who violated the Ethical Principles of Psychologists and Code of Conduct as they relate to fee practices, and a patient with the kind of psychological impairments of Mrs. Anderson, this Court sides with the patient. There should be no statute of limitations bar regarding any of the “Hilda, Paul and Frank” billings.
There is, therefore, a violation of G.L.c. 93A, secs. 2(a) and 9 in this case.
Under the circumstances here, should this Court impose multiple damages? Sayre’s billing methods could be seen as a willful or knowing violation of c. 93A, unless the actions of Conant, Mrs. Anderson’s attorney and holder of her power of attorney, in making payments without question can be seen to provide some cover.
In considering multiple damages, a judge “could properly decline to assess additional compensatory damages on [a] G.L.c. 93A claim because such an assessment would duplicate the jury’s award of damages.” Vassallo v. Baxter Healthcare Corporation, 428 Mass. 1, 23 (1998). See Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 235 (1984).
*228 Here, the jury assessed breach of contract damages in the amount of $463,450. This Court found $345,600 in improper billing. At the same time, both the jury and this Court found that Mrs. Anderson suffered no physical or mental harm from Sayre’s services and, in fact, was apparently better off for them. She did, of course suffer monetary damages, but, here too, those losses were compounded by the failures of her attorney. For reasons similar to those in Vassallo, albeit hardly precisely the same, this Court declines to order any multiple of the c. 93A damages against Sayre. It does, however, conclude that reasonable attorneys fees and costs incurred in connection with this action are to be included as part of Mrs. Anderson’s relief. See c. 93A, sec. 9(4).

ORDER FOR JUDGMENT

For the foregoing reasons, after determination of the attorneys fees and costs elements of the c. 93A claim, judgment shall enter in favor of the plaintiff, Hilda Ayer Anderson, against the defendant, Robert E. Sayre, on Counts VII, IX and XII of the Second Amended Complaint in the amount of $345,600, together with reasonable attorneys fees and costs incurred in connection with Count XII. Further, on Count VIII thereof, a declaration shall enter voiding all payments to Robert E. Sayre for psychological services rendered to Hilda Ayer Anderson in the amount of $345,600, and that Sayre shall disgorge such payments to Hilda Ayer Anderson, or pay as damages under Counts VII, IX or XII an amount equal to the sum to be disgorged.
There shall be only a single recovery for the damages imposed.

 Some were resolved before the Second Amended Complaint was filed.

 As noted above, all claims between the plaintiffs and Conant, including counterclaims, were settled on the evening before this case was scheduled to begin trial.

 Mrs. Anderson’s first name.

 At this time the only remaining defendant is Sayre.

 “You” is Joel Rosen, Esq., counsel for Sayre.